# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SAMUEL MILLIGAN,       )
           )
        Plaintiff,      )
           )
    v.             )      Case No.  09-cv-320-JPG-CJP
           )
           )
BOARD OF TRUSTEES, SOUTHERN    )
ILLINOIS UNIVERSITY,       )
           )
       Defendant.    )

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by defendant Board of Trustees of Southern Illinois University ("SIU Board") (Doc. 36).  Plaintiff Samuel Milligan has responded to the motion (Doc. 40), and the SIU Board has replied to that response (Doc. 42).

## I.      Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosed materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);  *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);  *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008);  *Spath*, 211 F.3d at 396. The standard is applied with special scrutiny in cases, such as discrimination cases, that often turn on issues of intent and credibility.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence

in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## II.    Facts

Viewed in Milligan's favor, the evidence in this case[1] establishes the following relevant facts.

Milligan enrolled as a freshman at SIU in August 2007. Milligan was 18 years old at the time. When he enrolled, he intended to major in chemistry and follow a pre-med course of study to prepare him to attend medical school upon graduation.

At the time, SIU had a sexual harassment policy that required a supervisor, department head or vice chancellor who received a written or oral complaint of sexual harassment to "take necessary action to resolve the complaint promptly." The policy states that, upon learning of a complaint, he or she should consult the Affirmative Action Office to determine the appropriate course of action. He or

---

[1]In its consideration of the evidence, the Court has disregarded hearsay testimony such as, for example, Kim Milligan's testimony regarding events about which she had no first-hand, personal knowledge. In ruling on a motion for summary judgment, the Court considers only evidence that would be admissible or usable at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Hearsay cannot be used to oppose a motion for summary judgment. *Id*.

she must submit a written report to the associate chancellor for diversity about the corrective action taken and any recommendations for formal disciplinary action.

Shortly after enrolling at SIU, Milligan was hired by Chris Kraft as a student worker in the chemistry department stockrooms in Neckers Hall, the building housing the chemistry department. Immediately across the hall from the first floor stockroom was the office of Dr. Cal Y. Meyers, an emeritus professor. Meyers was no longer employed by SIU but was the director of the Cal Meyers Institute, a research institute founded using a $2.5 million donation from Meyers to SIU. The Cal Meyers Institute was housed in Neckers Hall. As an emeritus professor, Meyers was permitted to use SIU's facilities. Meyers was 79 years old at the time and of slight build. He had no authority over student workers like Milligan and did not teach Milligan in any class.

Milligan's problems with Meyers began on October 4, 2007, when he passed Meyers in a hallway of Neckers Hall on his way to the first floor stockroom. Meyers told Milligan that with his hair, he would make a very sexy lady. Meyers then giggled, grabbed Milligan's buttocks, squeezed it and walked away. Milligan was angry and confused, and he told Kraft about the encounter. Kraft told him it sounded like something Meyers would do. He asked Milligan if he wanted to talk to someone about it and offered to accompany him, but Milligan declined. Kraft did not tell Milligan about SIU's sexual harassment policy and did not report the incident to anyone because he thought Milligan would be embarrassed. At some point, he advised Milligan to avoid Meyers if possible.

A week later, on October 11, 2007, Meyers approached Milligan while he was working at a desk in the first floor stockroom and asked Milligan if he knew where he could rent some hair like his because it would look pretty sexy on a lady. Meyers added that if Milligan were a lady, Meyers would surely date him. Meyers then laughed and left the stockroom.

The next day, October 12, 2007, Milligan and his mother, Kim Milligan ("Mrs. Milligan") met

with Dr. Gary Kinsel, chair of the chemistry department, about Meyers' behavior.  He explained that Meyers had been a greatly admired scientist and researcher and had been an asset to SIU.  He told Milligan and Mrs. Milligan that he was aware that Meyers had done other inappropriate things and that he was a problem, but that SIU could not really hold him accountable because he was in need of medical help.  He advised Milligan to avoid Meyers if possible.  Kinsel further explained that he did not have authority over Meyers because Meyers was not employed in the chemistry department but that Dr. John Koropchak, a vice-chancellor who oversaw institutional research, did.  Kinsel had already notified Koropchak, who was out of town at the time, of Milligan's complaints and had arranged for a meeting between Milligan and Koropchak to take place on October 17, 2007, after Koropchak returned from his travel.  Kinsel also reviewed SIU's sexual harassment policy with Milligan and Mrs. Milligan.  Kinsel was not familiar with the policy before this meeting and misunderstood parts of it, namely, whether a written, as opposed to an oral, complaint was necessary for a supervisor to take action.

In the meantime, having no authority to remove Meyers from the situation, Kinsel and Kraft decided to temporarily assigned Milligan to the second floor stockroom to reduce his chances of encountering Meyers.  Milligan was able to work the same number of hours in his new assignment and did not mind the change.  Nevertheless, on October 16, 2007, Milligan encountered Meyers in a stairwell in Neckers Hall.  Meyers told Milligan he would look sexy as a girl, giggled and pinched him in his lower abdomen right above his low-rise jeans waistline close to his genital area.  Meyers continued laughing and walked away.  He saw Meyers many other times on the second floor despite his new work assignment.

When Milligan and Mrs. Milligan met with Koropchak on October 17, 2007, Koropchak asked Milligan four or five times if he was sure he wanted to file a complaint against Meyers and initiate an

investigation. Undeterred by Koropchak's not-so-subtle efforts to discourage him, Milligan repeatedly confirmed that he did. Koropchak told them he would begin an investigation of Meyers' behavior and advised Milligan to avoid Meyers if possible. Milligan continued to see Meyers around campus, but Meyers exhibited no more harassing conduct toward Milligan. Milligan would have to go out of his way to avoid him on a number of occasions, once even being late for class, and felt uncomfortable and distracted.

After meeting with Milligan and Mrs. Milligan, Koropchak told Meyers that allegations of sexual harassment has been made against him and that his behavior would be monitored. In his investigation of Milligan's allegations, Koropchak learned that Meyers had exhibited harassing behavior to others, including Terry Christian, a female SIU employee. Koropchak concluded that Meyers had violated SIU's sexual harassment policy and, on November 8, 2007, issued him a letter of reprimand. The letter directed Meyers to cease all contact with student workers in the chemistry department and to complete SIU's sexual harassment training no later than December 1, 2007. The letter warned Meyers that if he committed any further violations or failed to comply with the conditions in the letter, he could be terminated as director of the Cal Y. Meyers Institute and lose his privileges at SIU.

Meyers did not comply with either directive in Koropchak's letter of reprimand. He did not attend the required sexual harassment training by the deadline (and attempted to negotiate with SIU's chancellor to be relieved from that requirement), and he began questioning Kraft and student workers about who had accused him of sexual harassment. He even went so far as to offer Kraft money to compensate for any trouble he might get into for revealing the source of the complaint. Kraft refused to reveal Milligan as Meyers' accuser despite Meyers' repeated requests for that information. On January 22, 2008, after Milligan had returned to working in the first floor stockroom, Meyers asked

Milligan if he knew who had accused him of sexually offensive behavior and if it was him.  Milligan mumbled a response and left the area.

After SIU found out about this contact from Mrs. Milligan on January 29, 2008, and noted that Meyers had not completed the required sexual harassment training, SIU Chancellor Fernando Treviño sent Meyers a letter dated January 31, 2008, immediately banning him from the campus pending completion of Koropchak's investigation and warning him that he was subject to arrest for trespassing if he was found on SIU property.  SIU legal and public safety personnel delivered the letter to Meyers. The ban was based on Milligan's reports and other instances of alleged sexual harassment discovered during the investigation of Milligan's complaint.  The ban was still in place as of March 2010.

Meyers did not comply with the ban and returned to campus a number of times.  Milligan saw Meyers on campus more than 20 times after he was banned.  Each time SIU public safety personnel became aware that Meyers was on campus – at least three times in March 2008 – pursuant to a standing directive of the director of public safety, they escorted him from campus but did not arrest him.  Prior to the order banning Meyers, SIU public safety officers had arrested others who had violated orders banning them from campus.

Milligan realized that he would have to encounter Meyers in Neckers Hall if he remained a chemistry major.  This realization, in combination with a newly-discovered interest in writing, caused him to change his major from chemistry to creative writing in February or March of 2008.

While all this was going on in the spring of 2008, Kraft began to believe Milligan was not taking his job as seriously as he had when he had first started working.  In the fall of 2007, Kraft thought Milligan had been a reliable worker in the chemistry stockroom, but in February 2008, Milligan asked to forego two work hours so he could have more time to study, leaving only one working day a week.  Milligan also called in sick two days, missed one day of work without

6

explanation and had an accident with a liquid nitrogen tank.  In April 2008, toward the end of the

semester, Kraft decided not to give Milligan any work in the fall 2008 semester and instead to reassign

his hours to more dependable employees.  Milligan found work in another SIU department in the fall

of 2008, the next time he was available for work at SIU.

Milligan filed this timely lawsuit on April 24, 2007, charging the SIU Board with sexual

harassment and retaliation in violation of Title IX of the Education Amendment Act of 1972 ("Title

IX"), 20 U.S.C. § 1681, *et seq.* (Count I) and of Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e *et seq*. (Count II).  The SIU Board has filed a motion for summary judgment on

Milligan's sexual harassment claims on the grounds that Meyers did not harass Milligan because of his

sex, that the harassment was not severe or pervasive enough to be actionable and that SIU acted

reasonably and without deliberate indifference in response to Milligan's complaints.  It also asks for

summary judgment on Milligan's retaliation claims on the grounds that there is no evidence of a

connection between Milligan's complaints an any material adverse employment action or educational

experience.  Milligan contends that a reasonable jury could find in his favor on his sexual harassment

and retaliation claims.

## III.   Analysis

### A.   Sexual Harassment

Title VII prohibits employment discrimination on the basis of sex:  "It shall be an unlawful

employment practice for an employer to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . gender . . . ."  42 U.S.C. § 2000e-2(a)(1).

Similarly, with some exceptions not relevant to this case, Title IX prohibits discrimination by

federally-funded educational institutions on the basis of sex:  "No person in the United States shall, on

7

the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ." 20 U.S.C. § 1681(a). These sex discrimination prohibitions include the prohibition of sexual harassment that creates a hostile work or school environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (Title VII); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (Title VII); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (Title IX); *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 (1992) (Title IX).

To establish a prima facie case of sexual harassment under Title VII, a plaintiff must show that (1) he was subjected to unwelcome harassment, (2) the harassment was because of his sex, and (3) the harassment was sufficiently severe or pervasive to alter the condition of employment and create a hostile or abusive atmosphere. *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731 (7th Cir. 2009) (citing *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007)). In Title VII cases involving harassment by someone who is not the plaintiff's supervisor, an employer can escape liability by showing that its response to the possibility of harassment was timely and reasonably likely to prevent the harassment. *Lucero*, 566 F.3d at 731; *Parkins v. Civil Constr. of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993). The employer's actions are not required to *actually* prevent further harassment, as long as it was *reasonably likely* to prevent future harassment. *Parkins*, 163 F.3d at 1035; *Saxton*, F.3d at 536.

The Title IX sexual harassment prima facie case is similar to the Title VII prima facie case except that, instead of examining the employment environment, it asks whether the harassment was so severe, pervasive and objectively offensive that it "deprive[s] the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999); *accord Lucero*, 566 F.3d at 731 (citing *Mary M. v. North Lawrence Cmty. Sch.*

*Corp.*, 131 F.3d 1220, 1228 (7th Cir .1997)).  Additionally, in Title IX cases, a defendant can only be liable if it was deliberately indifferent to harassing conduct of which it had actual knowledge.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

In its motion for summary judgment, the SIU Board argues that there is no evidence to satisfy the second and third elements of the Title VII and Title IX prima facie case.  It also argues it cannot be liable because SIU responded timely and reasonably to Milligan's complaints and did not act with deliberate indifference.  Milligan disagrees.

      1.    <u>Conduct Based on Sex</u>

The SIU Board argues that Milligan cannot show Meyers' harassment was because of Milligan's sex and that, in fact, Meyers harassed women equally to men.  Milligan, on the other hand, argues that Meyers' conduct resulted from Milligan's failure to satisfy male sexual stereotypes, a recognized theory under which harassment is because of sex.  Milligan also notes that SIU responded differently to his and Christian's sexual harassment complaints.

The law is clear that to be actionable, harassment must constitute "*discriminat[ion]* . . . because of . . . sex."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998) (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis in original).  Harassment is not discriminatory simply because it has sexual content or connotations.  *Id.*  It is only discriminatory if it causes disadvantageous terms or conditions of employment or education to one sex but not the other.  *Id.*  Discrimination can be found where, for example, harassment between a male and female – or by a homosexual same-sex harasser – involves explicit or implicit proposals of sexual activity that would not have occurred had the victim been of a different sex.  *Id.*  It can also be found where the harassment is motivated by general hostility to one gender.  *Id.*  So long as a plaintiff can show he would not have been treated in the same way had he been a woman, he has proven sex discrimination.  *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009

(7th Cir. 1999).  On the other hand, "inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex," is not unlawful discrimination.  *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) (sexual harassment of husband *and* wife not actionable because not discriminatory).

The evidence shows Meyers did not discriminate between men and women in his offensive treatment, and his actions did not include proposals of sexual activity that would not have been made to the opposite gender.  In addition to Milligan, Meyers harassed Christian and at least one other female student.  Thus, as with the harasser in *Holman*, Meyers did not create any adverse condition for one gender over another.  He cannot therefore have been discriminatory in his harassment, and his harassment could not have been "because of" Meyers' sex.

There is also no evidence of sexual stereotyping to support discrimination on the basis of sex.  Sexual stereotyping was recognized as evidence of sex discrimination in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  In that case, the Supreme Court recognized a Title VII discrimination cause of action where a female accountant was not offered a partner position in an accounting firm in part because she was not feminine enough, that is, because she did not meet the firm's expectations of how women should look and behave.  *Id.* at 235.  Even after *Oncale*, courts have considered sexual stereotyping as a type of evidence able to support a sexual harassment hostile environment claim.  *See Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1062 (7th Cir. 2003);  *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085 (7th Cir. 2000).  To determine if sexual stereotyping supports an inference of discrimination because of sex, the Court must consider all the evidence of harassment in context.  *Spearman*, 231 F.3d at 1085.

In this case, Meyers told Milligan that, with his hair, he would make a very sexy lady, that he would look sexy as a girl, and that if he were a lady Meyers would surely date him.  He also asked Milligan where he could rent hair like his because it would look sexy on a lady and touched him on

10

two occasions.  None of these acts show Meyers thought Milligan was not satisfying traditional stereotypes of how a man should look or behave.  They simply demonstrated an unusual fascination with Milligan's hair, a desire to meet a woman with such hair, and a failure to observe personal boundaries.  Therefore, Meyers' acts are not evidence of harassment because of sex.

Milligan attempts to argue that SIU treated Milligan's complaints of harassment differently from Christian's because of his sex.  This argument is off the mark.  The relevant question is whether the *harassment* creating the hostile environment was because of sex, not whether SIU's *response* differed because of sex.  Whether SIU responded differently to Milligan's and Christian's complaints may be relevant to the adequacy of its response, but it is not relevant to whether the harassment amounted to discrimination because of sex.

In sum, there is no evidence from which a factfinder could reasonably find Meyers' conduct toward Milligan was because of his sex.  Therefore, Milligan cannot satisfy the second element of his prima facie Title VII or Title IX case.

### 2.   Hostile Environment

Even if Milligan could show Meyers' harassment was because of Milligan's sex, he cannot show the harassment was sufficiently severe or pervasive.

#### a.   Title VII

With respect to Title VII, a hostile work environment is created by conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  Sexual harassment that creates a hostile work environment is actionable under Title VII only if it is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'"  *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998) (quoting

11

*Meritor*, 477 U.S. at 67) (further internal quotations omitted); *see also*; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). "[H]arassing conduct does not need to be both severe and pervasive. One instance of conduct that is sufficiently severe may be enough." *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (internal citations omitted). Additionally, "[t]he employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Cooke v. Stefani Mgmt. Servs.*, 250 F.3d 564, 566-67 (7th Cir. 2001) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993)).

What is sufficient to constitute an objectively hostile working environment is not an easy task. It must be judged by "'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher*, 524 U.S. at 787-788 (quoting *Harris*, 510 U.S. at 23) (further internal quotations omitted); *accord Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotations and citations omitted).

Generally, inappropriate physical touching is considered more severe than mere verbal behavior, and the severity will depend, of course, on the nature of the touching. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685-86 (7th Cir. 2010). The Seventh Circuit has found conduct sufficient to withstand summary judgment in the following situations:

> where there were allegations that a defendant placed his hand on the plaintiff's breast for several seconds, [*Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001)], when a co-worker forcibly kissed the plaintiff and nearly removed her brassiere, *Hostetler* [*v. Quality Dining, Inc.*, 218 F.3d 798, 807-08 (7th Cir. 2000)], when a manager slid his

hand up the plaintiff's shorts, reaching her underwear, *Patton* [*v. Keystone RV Co.*, 455 F.3d 812, 814 (7th Cir. 2006)], and when the plaintiff's supervisor "hugged her fifty to sixty times, jumped in her lap ten times, [and] touched her buttocks thirty times," *Kampmier* [*v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007)].

*Turner*, 595 F.3d at 686 (concluding that harasser's grabbing plaintiff's penis through his pockets was "probably severe enough on its own to create a genuine issue of material fact").

On the other hand, the Seventh Circuit has found that cases not involving touching or involving relatively limited touching have not established an objectively hostile working environment. *Id.* (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (only verbal harassment); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (one occasion of touching and rubbing plaintiff's leg, one instance of kissing for several seconds, and one instance of "lurching" at her as if to grab her)); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) ("teasing about waving at squad cars [like a prostitute might], ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye contact, and four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks"); *but see Boumehdi*, 489 F.3d at 789 ("A jury reasonably could conclude [that] at least eighteen sexist or sexual comments in less than a year's time and . . . similar comments . . . made 'very often,' . . . was pervasive enough to create a hostile work environment.").

In the case at bar, the SIU Board does not contest that Milligan subjectively considered Meyers' conduct to create a hostile working environment. Thus, the Court's inquiry focuses on whether Meyers created an objectively hostile work environment for Milligan.

The Court concludes that no reasonable jury could find that Meyers' harassment of Milligan was objectively severe or pervasive enough to alter the terms and conditions of his employment or to create a hostile working environment. To be sure, Meyers was boorish and behaved outside socially acceptable norms. However, his offensive conduct involved only two instances of touching, one on

13

the buttocks and one on the lower abdomen.  While this constitutes excessive physical intrusion, both instances were fleeting.  Together, they were much less severe than the instances in *Saxton* that were found not to amount to an objectively hostile work environment.  Additionally, the verbal conduct that accompanied the physical contact was far more annoying than threatening or humiliating.  Although Meyers was a professor and therefore had a higher ranking position than Milligan, he was not Milligan's supervisor or teacher such that his actions carried a significant implicit threat to his job or grades.  Finally, there is no indication that any of Meyers' conduct interfered with Milligan's work performance.  Indeed, for the remainder of the 2007 fall semester, Kraft found Milligan performed his job well.  Finally, the entire scope of the harassment spanned less than two weeks, and there was only one additional incident where Meyers questioned Milligan more than three months later.  A reasonable person simply would not find that Milligan's three encounters with Meyers in October 2007 and the one encounter in January 2008 created a hostile work environment.

        b.    <u>Title IX</u>

With respect to Title IX, a hostile educational environment is created by conduct that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."  *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 651 (1999).  "The harassment must have a 'concrete, negative effect' on the victim's education."  *Gabrielle M. v. Park Forest-Chicago Heights, Ill., Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (quoting *Davis*, 526 U.S. at 654).  As with Title VII cases, whether harassing conduct meets the required threshold "'depends on a constellation of surrounding circumstances, expectations, and relationships,' including, but not limited to, the ages of the harasser and the victim and the number of individuals involved."  *Id.* at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).  Courts have

14

found harassment to be sufficiently severe, pervasive or objectively offensive where, for example, it results in dropping grades, *Davis*, 526 U.S. at 634, a victim's becoming homebound or hospitalized, *see Murrell v. School Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248-49 (10th Cir. 1999), or physical violence, *see Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000). *Gabrielle M.*, 315 F.3d at 823 (finding psychological problems not sufficient negative effect where grades remained steady and absenteeism did not increase); *but see Gabrielle M.*, 315 F.3d at 828-29 (Rovner, Circuit Judge, concurring) (rejecting notion that victim's resiliency renders otherwise hostile environment acceptable). In determining whether a hostile educational environment exists, courts are guided by hostile work environment law. *See Smith v. Metropolitan Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997).

In this case, Meyers' behavior did not have any concrete, negative effect on Milligan's education. There is no evidence that as a result of Meyers' conduct in October 2007 Milligan's classroom learning environment[2] was changed in any way, that he was foreclosed from any educational opportunity at SIU, that his grades dropped or that he was absent from class substantially more than before October 2007. The fact that Milligan felt uncomfortable and distracted are simply not concrete enough injuries to support a finding that Meyers' harassment was severe, pervasive or objectively hostile enough to be actionable under Title IX. While it is also true that Meyers' October 2007 behavior and his subsequent late January 2008 questioning of Milligan were substantial factors in persuading Milligan to change his major from chemistry to creative writing, that choice was based on Milligan's desire to avoid Neckers Hall and Meyers even though his offensive harassment had stopped four to five months earlier. No reasonable jury could find that Meyers' harassing conduct months

---

[2]To the extent Milligan claims his work-study job in the chemistry department stockrooms was a part of his educational experience, the impact on that educational opportunity is addressed in the section of this order discussing Milligan's work environment.

earlier and a single instance of questioning Milligan about whether he reported Meyers was so severe, pervasive or objectively offensive to deny Milligan the opportunity to major in chemistry.  Milligan simply did not suffer an actionably hostile educational environment.

>    3.    SIU's Response

Alternatively, the SIU Board is entitled to summary judgment on Milligan's Title VII and Title IX claims because it responded appropriately to Meyers' harassment.

>    a.    Title VII

Under Title VII, an employer is obligated to take reasonable and timely steps to discover and remedy sexual harassment by someone who is not the victim's supervisor.  *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 356 (7th Cir. 2002);  *Parkins v. Civil Constr. of Ill., Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998);  *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993).  The employer's actions are not required to *actually* prevent further harassment, as long as it was *reasonably likely* to prevent future harassment.  *Parkins*, 163 F.3d at 1035; *Saxton*, F.3d at 536.

In this case, SIU's reluctant response to Meyers' harassment of Milligan was hardly a model, but it was reasonable, and it was effective to stop Meyers' harassing conduct.  It is clear that SIU had failed to educate Kraft, Milligan's immediate supervisor, about the contents of SIU's sexual harassment policy such that he knew the appropriate action to take if one of his subordinates experience sexual harassment.  Nevertheless, Kraft hit on a reasonable response, probably out of his own intuition that sexual harassment should be reported.  He asked Milligan if he wanted to report it to someone and offered to go along with him if he needed support, but Milligan declined the offer. Kraft's response did not comport with SIU's sexual harassment policy, under which Kraft should have consulted a sexual harassment information advisor for assistance, recommended Milligan consult with such an advisor, consulted the Affirmative Action Office, and filed a report.  However, the failure to

comply with a sexual harassment policy does not by itself render a response unreasonable.  Kraft's response was reasonable in light of Milligan's decision not to pursue a complaint at that time, although it did not prevent further harassment.

Kinsel's response left a lot to be desired, but in the end it was reasonable.  A reasonable jury could find that Kinsel's reminder about Meyers' former great stature and value to SIU was a not-so-subtle attempt to convey to Milligan that SIU's loyalties might be divided in this fight.  His suggestion that Meyers could not be held accountable for his actions because he was old and sick was appalling.  Instead of demonstrating receptiveness to complaints about Meyers' improper behavior, a problem of which Kinsel was aware at the time in connection with others, Kinsel clearly discouraged or minimized them.  Milligan and his mother were right to remind Kinsel that Milligan should not be the one to suffer because of Meyers' failings.  Nevertheless, Kinsel took appropriate action by contacting Meyers' supervisor, Koropchak, and arranging a meeting at the earliest possible time.  He also worked with Kraft in an attempt to separate Milligan from Meyers during the investigation by reassigning Milligan to an equivalent position away from Meyers' office.

Koropchak similarly tried to discourage Milligan from pursuing a complaint against Meyers by asking him repeatedly whether he was sure he wanted to file a complaint.  Again, Milligan's persistence elicited a reasonable response; Koropchak promptly warned Meyers to behave, investigated the situation and found evidence that Meyers had violated SIU's sexual harassment policy on a number of occasions.  Three weeks after meeting with Milligan and his mother, Koropchak issued Meyers a letter of reprimand, directed him to attend sexual harassment training and instructed him to stay away from student workers.  This was a reasonable response in light of the fact that it was the first time a formal complaint for sexual harassment had been brought against Meyers.  The reprimand, in fact, stopped Meyers' inappropriate conduct of the type that occurred in October 2007.

17

When SIU first noticed Meyers had not complied with the letter and had confronted Milligan, it stepped up the discipline to ban Meyers from campus.  This was a reasonable response to Meyers' thumbing his nose at Koropchak's earlier directives.  When Meyers ignored the ban as well, SIU public safety personnel escorted him from campus whenever they became aware of his presence, again, a reasonable response.  Milligan argues that they should have arrested Meyers when it became apparent he was not complying with the ban.  However, the Court must keep in mind that the primary purpose of SIU's discipline and of Title VII is to prevent discrimination – in this case, sexual harassment – not to ensure complete compliance with disciplinary measures.  Disciplinary compliance is a matter for SIU's administration, and the Court will not interfere unless the failure to comply also results in additional sexual harassment or other unlawful conduct.  It did not in this case.

In sum, although SIU's response was far short of perfect, it was reasonable and timely, and it prevented further harassment of Milligan.

### b.   Title IX

Liability under Title IX can only be imposed if the defendant is deliberately indifferent to sexual harassment, that is, if the defendant made an official decision not to remedy the situation. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).  That means a school would be liable for sexual harassment where (1) the harassment is known by a school official with the authority to correct the problem and (2) the official's response is "clearly unreasonable."  *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 645, 648-49 (1999);  *Doe-2 v. McLean County Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 512 (7th Cir. 2010);  *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 824 (7th Cir. 2003).

For the reasons stated in the foregoing section, SIU's response to Milligan's reports of sexual harassment by Meyers was not "clearly unreasonable" and was not an official decision not to remedy

the situation.  Thus, it was not deliberately indifferent to the harassment, and the SIU Board cannot be liable under Title IX for sexual harassment.

B,      Retaliation

Title VII prohibits retaliation for reporting sexual harassment:  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Although it does not expressly mention retaliation, Title IX contains an implied prohibition on retaliation within its prohibition of discrimination.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.").

To establish a retaliation claim under Title VII, a plaintiff may use a direct method or an indirect, burden-shifting method.  *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).  The Title VII retaliation analysis can also be adapted to apply to Title IX retaliation claims.  *See, e.g., Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 934 (C.D. Ill. 2002);  *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002).

1.      Direct Method

Under the direct method, the plaintiff must present evidence that (1) he engaged in a statutorily protected activity, (2) the employer took an adverse action, and (3) there was a causal connection between the two.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007).  The SIU Board does not dispute that Milligan's sexual harassment complaint was a statutorily protected activity.  Thus, the Court focuses on the second two elements – an adverse employment action and a

causal connection.

Milligan argues that his transfer to the second floor stockroom on the heels of his complaint is a materially adverse action. A materially adverse action in the employment context need not affect the terms and conditions of an employee's employment and need not even occur at the workplace. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006). The Title IX equivalent means that the retaliation need not affect the educational environment or occur in the school. *White* held that a retaliation plaintiff must only establish "action[] that would have been materially adverse to a reasonable employee." *Id.* at 56. This includes actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. Whether a reassignment of job duties constitutes a materially adverse action depends on the circumstances of the case and how a reasonable person in the plaintiff's position would view the reassignment. *Id.* at 71.

No reasonable jury could find that Milligan's transfer to the second floor chemistry stockroom constitutes a materially adverse action likely to dissuade a reasonable person in Milligan's position from reporting sexual harassment. Milligan testified that he did not mind the change, indicating that it was not a negative reassignment. Furthermore, although Milligan argues the transfer resulted in fewer hours, and therefore lower pay, than he had when he worked in the first floor stockroom, the evidence does not support that argument. Kraft testified that Milligan worked no fewer hours after the reassignment, and Milligan admitted that the only time his hours were reduced was when he asked to have them lowered in the spring of 2008. To the extent Milligan might have lost the opportunity to work more hours in the fall of 2007 had he worked in the first floor stockroom, that speculative benefit is not sufficient to render the reassignment materially adverse.

Milligan also argues his April 2008 termination from his job in the chemistry department

stockrooms was in retaliation for his sexual harassment complaint.  A termination could certainly be considered an adverse employment action, although that conclusion may be questioned when the employee is rehired in another job, as Milligan was when school began again in the fall of 2008, the next time he was available for work at SIU.  However, even if his termination was a materially adverse action, Milligan stumbles on the causal connection requirement.  Milligan relies on the fact that his termination from the chemistry department job followed his complaint, but the temporal sequence is not sufficient to establish a causal connection.  Generally, unless extremely suspicious, "timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim."  *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007);  *see Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008)  (seven-week interval cannot create causal connection).  Here, Milligan's termination was approximately six months after he complained about Meyers' behavior and more than two months after Mrs. Milligan reported the January 2008 contact.  These extended periods are insufficient to support an inference of causation.

Because the evidence does not establish retaliation using the direct method, Milligan must rely on the indirect method.

### 2.    Indirect Method

In order to prevail on a Title VII claim for retaliation using the burden-shifting mechanism, a plaintiff must first establish a prima facie case by showing that (1) he engaged in a statutorily protected activity, (2) he performed his job according to his employer's legitimate expectations, (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004).  In the Title IX context, the test is modified for the educational context.  There is no need to show a causal connection using the indirect method.  *Rhodes v. Illinois Dep't of Transp.*,

359 F.3d 498, 508 (7th Cir. 2004).  The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action.  *Hudson*, 375 F.3d at 559**.**  If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff to show that the articulated reason is actually a pretext for discrimination.  *Id.*  Because the Court has already determined Milligan's reassignment to the second floor stockroom is not an adverse employment action, the Court focuses now solely on his termination.

In this case, the second prong of the prima facie case merges with SIU's legitimate, non-discriminatory reason for terminating him.  The evidence shows Milligan was not meeting his employer's legitimate expectations, and that that was Kraft's reason for deciding to terminate him.  Kraft testified Milligan had become an unreliable worker and that he needed to reassign Milligan's hours to other, more reliable employees.  Milligan does not contest Kraft's assertion about his performance but instead focuses on the way Kraft told him he was letting him go.  Kraft told him he had no hours for him to work but did not mention Milligan's poor performance.  Kraft testified that he had no hours for Milligan to work because he had assigned them all to more reliable employees.  There is nothing suspicious about these two ways of saying the same thing, especially when Milligan's decline in performance is undisputed, and therefore nothing that could lead to the inference that Kraft's reasons were pretextual.

Milligan has also failed to point to a similarly situated employee who did not file a sexual harassment complaint and who was treated better than he was.  To be similarly situated, an employee must be "directly comparable . . . in all material respects."  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002);  *accord Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007).  Those "material respects" depend on the specific situation involved in the case and may include whether the employees dealt with the same supervisor, were subject to the same standards, or

had comparable experience, education and qualifications, if the employer took these factors into account when making the personnel decision in question.  *Patterson*, 281 F.3d at 680.  While the plaintiff need not point to a virtual twin, he must point to someone who is similar enough in a common sense analysis "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable."  *Filar v. Board of Educ.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (brackets in original), *aff'd*, 553 U.S. 442 (2008)).

Milligan suggests Christian was similarly situated, did not report Meyers' sexual harassment and was not terminated from her job.  However, the evidence does not show Christian had a similar work performance history, which was the critical factor leading to Milligan's termination.  If Christian and Milligan were not similar in their performance histories, they cannot be comparables for the purpose of establishing a prima facie case of retaliation using the indirect method.

For these reasons, the Court believes no reasonable jury could find for Milligan on his Title VII or Title IX retaliation claim, and the SIU Board is entitled to summary judgment.

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS** the SIU Board's motion for summary judgment (Doc. 36) and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**Dated:  June 30, 2010**

s/ J. Phil Gilbert
**J. Phil Gilbert**
**U.S. District Judge**